# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| MARK JIMENEZ, derivatively on behalf of KRISPY KREME, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JOSHUA CHARLESWORTH, JEREMIAH ASHUKIAN, MARISSA ANDRADA, DAVID BELL, PATRICIA CAPEL, DAVID DENO, OLIVIER GOUDET, PAUL MICHAELS, GERHARD PLEUHS, DEBBIE ROBERTS, PHILIP TELFER, and MICHELLE WEESE, <br><br> Defendants, <br><br> and <br><br> KRISPY KREME, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Mark Jimenez ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Krispy Kreme, Inc. ("Krispy Kreme" or "KKI" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Joshua Charlesworth ("Charlesworth"), Jeremiah Ashukian ("Ashukian"), Marissa Andrada ("Andrada"), David Bell ("Bell"), Patricia Capel ("Capel"), David Deno ("Deno"), Olivier Goudet ("Goudet"), Paul Michaels ("Michaels"), Gerhard Pleuhs ("Pleuhs"), Debbie Roberts ("Roberts"), Philip Telfer

("Telfer"), and Michelle Weese (collectively, the "Individual Defendants," and together with KKI, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of KKI, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and against Defendants Charlesworth and Ashukian for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding KKI, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 25, 2025 through May 7, 2025, both dates inclusive (the "Relevant Period").

2.     Krispy Kreme, along with its subsidiaries, is a longstanding and globally recognized brand of confectioneries. Among the Company's most well-known products is its "Original Glazed" doughnut which the Company touts ". . . is recognized for its fresh, hot-off-the-line, melt-in-your-mouth experience." The Company also features limited time offerings and seasonal activations of other doughnut flavors, including but not limited to specialty flavors for

2

Valentine's Day and other holidays. The Company has operated for the past eighty-seven years and currently operates in forty countries. Krispy Kreme conducts its business through its own network of shops referred to as "Doughnut Shops," as well as through retailers and a growing digital and delivery business.

3.     On March 26, 2024, KKI announced an expansion of the Company's partnership with the global fast food chain McDonald's Corporation ("McDonald's") nationwide, commencing in the latter half of 2024. The announcement, among other things, represented that KKI and McDonald's would work together to sell Krispy Kreme doughnuts at McDonald's restaurants nationwide and would create a deployment schedule to achieve that goal.

4.     However, this plan soon proved to be more difficult than originally anticipated, as sales of Krispy Kreme doughnuts in McDonald's declined substantially following the marketing launch of the partnership expansion.

5.     The truth emerged on May 8, 2025 when the Company reported unsatisfactory financial results—notably, a decline in net revenue and a larger net loss than the previous year. In particular, the Company reported that its "net revenue was $375.2 million… a decline of 15.3%" and further reported a "net loss of $33.4 million, compared to prior year net loss of $6.7 million." During this announcement, the Company also revealed that it was "reassessing [its] deployment schedule together with McDonald's" and "withdrawing [its] prior full year outlook and not updating it" due in part to "uncertainty around the McDonald's deployment schedule."

6.     On this news, the price of the Company's common stock fell $1.07 per share, or **24.71%**, from a closing price of $4.33 per share on May 7, 2025 to close at $3.26 per share on May 8, 2025, on unusually heavy trading volume.

7.     During the Relevant Period, the Individual Defendants breached their fiduciary

duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) demand for Krispy Kreme products at McDonald's locations was substantially lower than during the marketing launch of the partnership; (2) the demand or lack thereof for Krispy Kreme products at McDonald's locations was a leading factor in the Company's decline in average sales per door per week; (3) the Company's partnership with McDonald's was not financially viable; (4) the partnership's lack of profitability created a material risk to its continuation; and (5) as a consequence of the partnership's lack of profitability, the Company would halt further expansion into McDonald's locations. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

9.      Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in a lucrative insider sale of Company common stock while the price of stock was artificially inflated, obtaining proceeds of ***roughly $58,000.***

10.      The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.      In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO")/President, and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the

4

Western District of North Carolina (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's/President's, the CFO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of

the United States that it would not otherwise have.

16.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

17.    Plaintiff is a current shareholder of KKI. Plaintiff has continuously owned Company common stock since first purchasing the stock on November 16, 2021.

### Nominal Defendant KKI

18.    KKI is a Delaware corporation with its principal executive offices at 2116 Hawkins Street, Charlotte, NC 28203. KKI's common stock trades on The Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "DNUT."

### Defendant Charlesworth

19.    Defendant Charlesworth has served as the Company's President and CEO since January 2024 and as a Company director since January 2024.

20.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Charlesworth made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|------|-------------|----------------------|----------|
| April 4, 2025 | 5,943 | $4.47 | $26,565 |
| May 1, 2025 | 7,638 | $4.10 | $31,316 |

6

Thus, in total, before the fraud was exposed, he sold 13,581 shares of Company common stock on inside information, for which he received approximately $58,000 in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

21.     The Schedule 14A the Company filed with the SEC on April 28, 2025 (the "2025 Proxy Statement") stated the following about Defendant Charlesworth:

Biographical Information

Josh Charlesworth has served as a member of the Board of Directors and our President and Chief Executive Officer since January 2024. He served as our Global President from June 2022 to December 2023 and our Chief Operating Officer from May 2019 to December 2023. Mr. Charlesworth served as our Chief Financial Officer from April 2017 to January 2023 and our Corporate Secretary from July 2018 to August 2020. Prior to joining Krispy Kreme, Mr. Charlesworth held various leadership positions at Mars, Incorporated. He most recently served as Global Chief Financial Officer of Mars Chocolate from January 2015 to April 2017.

Qualifications

Mr. Charlesworth holds a B.Sc. in Economics from the London School of Economics and is a member of the Chartered Institute of Management Accountants. We believe Mr. Charlesworth's extensive executive-level experience in the food and retail industries, as well as his role as our CEO, qualifies him to serve on our Board.

**Defendant Ashukian**

22.     Defendant Ashukian has served as the Company's Executive Vice President and CFO since January 2023.

23.     The 2025 Proxy statement stated the following about Defendant Ashukian:

Jeremiah Ashukian, age 45, has served as our Executive Vice President and Chief Financial Officer since January 2023. Prior to joining Krispy Kreme, he held various CFO roles across North America and Latin America at Mars Inc. Mr. Ashukian held several finance positions earlier in his career across all aspects of the finance function and has extensive experience in building diverse and effective teams, functional and business transformations, integrations, M&A, and portfolio management. Mr. Ashukian holds an undergraduate degree in Mathematics from

7

Sir Wilfrid Laurier University as well as C.M.A. and C.P.A. designations from Ontario, Canada.

**Defendant Andrada**

24.     Defendant Andrada has served as a Company director since February 2022 and also serves as the Chair of the Remuneration and Nomination Committee. Previously, Defendant Andrada served as the Chair of the Remuneration Committee.

25.     The 2025 Proxy Statement states the following about Defendant Andrada:

Biographical Information

Marissa Andrada has served as a member of our Board since February 2022. Ms. Andrada served as Chief Diversity, Inclusion and People Officer of Chipotle Mexican Grill (NYSE: CMG, "Chipotle") from July 2020 to August 2022. She served as Chipotle's Chief People Officer from April 2018 to June 2020. Prior to joining Chipotle, Ms. Andrada served as Senior Vice President of Human Resources & Chief Human Resources Officer of Kate Spade & Company/tapestry (Coach, Inc.) from July 2016 to October 2017. From November 2010 to March 2016, she held various Senior Vice President positions at Starbucks Coffee Company (NASDAQ: SBUX). She has also served in the head of human resources role with various other companies, including GameStop Corporation (NYSE: GME) and Red Bull North America, Inc.

Qualifications

Ms. Andrada holds an M.B.A. from Pepperdine University and a B.S. in Business Administration from California State Polytechnic University at Pomona. We believe that Ms. Andrada's significant experience in the quick service restaurant and retail industries qualifies her to serve on our Board.

**Defendant Bell**

26.     Defendant Bell has served as a Company director since September 2016.

27.     The Schedule 14A the Company filed with the SEC on April 24, 2024 (the "2024 Proxy Statement") stated the following about Defendant Bell:

Biographical Information

David Bell has served as a member of our Board since September 2016. Mr. Bell is currently a Senior Partner at JAB Holding Company, where he joined as a Partner in 2012. Prior to that, Mr. Bell held various positions in corporate development and

8

corporate strategy at Mars, Incorporated from 2008 to 2012. Mr. Bell also held various positions at Goldman Sachs, including serving as Vice President, from 2000 to 2008. Prior to that, Mr. Bell served as an associate at Perseus, L.L.C. from 1996 to 1998 and Senior Auditor at PricewaterhouseCoopers LLC from 1993 to 1996. Mr. Bell is also currently a member of the board of directors of Panera Bread Company, JAB Holding Company, and NVA Management LLC.

Qualifications

Mr. Bell holds a B.S. in Commerce from the University of Virginia and an MBA from the Wharton School at the University of Pennsylvania. We believe that Mr. Bell's significant financial and industry experience qualifies him to serve on our Board.

**Defendant Capel**

28.     Defendant Capel has served as a Company director since June 2024.

29.     The 2025 Proxy Statement stated the following about Defendant Capel:

Biographical Information

Patricia Capel has served as a member of our Board since June 2024. She previously served as a member of our Board from April 2021 to September 2022. Ms. Capel is currently a Senior Partner at JAB Holding Company, where she joined as a Partner in 2021. Prior to that, Ms. Capel spent 25 years at AB InBev and Ambev, where she most recently led the commercial operations in Chile, Bolivia and Paraguay. Ms. Capel has extensive global experience including in the United States, Russia, Latin America, Belgium, and Canada. At AB InBev, she held numerous roles, including VP Finance and VP of Global People. Ms. Capel has also worked at PricewaterhouseCoopers LLC and Cargill Agricola. Ms. Capel is currently a member of the board of directors of JDE Peets N.V. (AMS:JDEP), Panera Brands, Inc., and several other JAB controlled companies.

Qualifications

Ms. Capel holds a Bachelor's degree in Business Administration from Universidade de Sao Paulo, and an M.B.A. from Business School Sao Paulo. We believe that Ms. Capel's significant experience with global companies and expertise in the consumer products industry qualifies her to serve on our Board.

**Defendant Deno**

30.     Defendant Deno has served as a Company director since September 2016 and currently serves as the Chair of the Audit and Finance Committee. Defendant Deno previously

9

served as the Chair of the Audit Committee.

31.     The 2025 Proxy Statement stated the following about Defendant Deno:

Biographical Information

David Deno has served as a member of our Board since September 2016. Mr. Deno is the retired Chief Executive Officer of Bloomin' Brands, Inc. (NASDAQ: BLMN, "Bloomin' Brands"), a position he held from March 2019 to December 2024. Mr. Deno served as the Chief Financial and Administrative Officer of Bloomin' Brands from 2012 to 2019. As Chief Financial Officer of Bloomin' Brands, Mr. Deno led the company's successful initial public offering, including establishing financial processes and systems to enable continued success, led the company through the difficult COVID period, and executed a successful strategy including investments in the U.S. brands and Brazilian team to enable the company to operate as one of the top casual dining restaurant companies in the world. Mr. Deno's career has included more than 15 years in senior level operations and financial positions at PepsiCo, Inc. (NASDAQ: PEP) and YUM! Brands, Inc. (NYSE: YUM, formerly a subsidiary of PepsiCo) where he served as Chief Financial Officer and then Chief Operating Officer. As Chief Financial Officer at YUM! Brands, he helped set the strategy for a new public company and establish financial processes and systems to enable success. As a result, YUM! grew its U.S. and International business significantly, resulting in a significant increase in shareholder value. He previously served as a member of the board of directors of Bloomin' Brands, Peet's Coffee, and Caribou/Einstein Bagels. Mr. Deno is currently a member of the board of directors of Panera Brands.

Qualifications

Mr. Deno holds a B.A. in Economics and Political Science from Macalester College and an M.B.A. from the University of Michigan. We believe that Mr. Deno's experience working with global brands in the consumer products industry, extensive management experience and deep understanding of financial control matters qualifies him to serve on our Board.

**Defendant Goudet**

32.     Defendant Goudet has served as a Company director since September 2016 and as Chairman of the Board since May 2017.

33.     The 2024 Proxy Statement stated the following about Defendant Goudet:

Biographical Information

Olivier Goudet has served as a member of the Board since September 2016 and as

10

Chairman since May 2017. Mr. Goudet is currently a Senior Investment Advisor at JAB Holding Company, where he was previously Managing Partner and Chief Executive Officer from 2012 to 2023. He is also currently the Chairman of the board of directors of JDE Peets (AMS: JDEP) and a member of the board of directors of Keurig Dr. Pepper (NASDAQ: KDP), Coty Inc. (NYSE: COTY), and several other JAB controlled Companies. Mr. Goudet is the former Executive Vice President and Chief Financial Officer of Mars, Inc. and has served as an independent advisor to the of Mars Board of Directors. Mr. Goudet began his career at Mars, Inc. serving on the finance team of its French business and held several senior executive positions at the VALEO Group, including Group Finance Director.

Qualifications

Mr. Goudet holds a degree in Engineering from l'Ecole Centrale de Paris and graduated from the ESSEC Business School in Paris with a major in Finance. We believe that Mr. Goudet's extensive financial expertise and senior executive experience, as well as significant governance and oversight experience attained through his tenure as a director of several public companies, qualifies him to serve on our Board.

### **Defendant Michaels**

34.     Defendant Michaels has served as a Company director since May 2017 and also serves as a member of the Audit and Finance Committee and as a member of the Remuneration and Nomination Committee.

35.     The 2024 Proxy Statement stated the following about Defendant Michaels:

Biographical Information

Paul S. Michaels has served as a member of our Board since May 2017 and serves as Lead Independent Director and Vice Chairman. Mr. Michaels served as the Chief Executive Officer of Mars from 2004 to January 2015. Before joining Mars, Mr. Michaels spent 15 years at Johnson & Johnson (NYSE: JNJ) in multiple consumer divisions. Since his retirement he has actively participated as an independent director on the following boards: Coty Inc. (NYSE: COTY) from June 2015 to December 2020, Dyla LLC since January 2018, Compassion First Vet Hospitals from May 2019 to December 2020, and Keurig Dr. Pepper Inc. (NASDAQ: KDP) since July 2018.

Qualifications

Mr. Michaels holds a B.A. from the University of Notre Dame. We believe that Mr. Michaels' expertise and creativity in launching, building, and supporting global

11

brands in the consumer products industry and his extensive executive experience with complex multinational consumer product organizations qualifies him to serve on our Board.

**<u>Defendant Pleuhs</u>**

36.     Defendant Pleuhs has served as a Company director since June 2022 and also serves as a member of the Audit and Finance Committee and as a member of the Remuneration and Nomination Committee.

37.     The 2024 Proxy Statement stated the following about Defendant Pleuhs:

Biographical Information

Gerhard W. Pleuhs has served as a member of our Board since June 2022. Mr. Pleuhs was appointed as interim Lead Independent Director in December 2024 and as Lead Independent Director in April 2025. He currently serves as a member of the board of directors of Panera Brands, Inc. From 2019 until his retirement in 2021, Mr. Pleuhs served as Executive Vice President, Corporate & Legal Affairs and General Counsel for Mondelēz International, Inc. (NASDAQ: MDLZ, "MDLZ"). In this role, he oversaw MDLZ's communications, sustainability, and public and government affairs teams as well as the legal, corporate secretarial, compliance, and security functions. Prior to being elevated to this role, Mr. Pleuhs served as MDLZ's Executive Vice President and General Counsel between 2012 and 2019. During his more than 30-year career with MDLZ (formerly Kraft Foods Inc. "Kraft"), Mr. Pleuhs led the legal workstream to successfully spin off Kraft's North American grocery operations into the company that is now The Kraft Heinz Company. In addition, Mr. Pleuhs was involved in and negotiated multiple multi-billion M&A transactions, including Cadbury, and successfully managed so-called activist investor involvement in the MDLZ board of directors. During his career, he has also served as a director on the board of directors of each of the following: the Supervisory Board Kraft Foods Deutschland Holding GmbH (President from 2008-2015), Dong Suh Foods Corporation in Seoul, Korea, JDE Peet's N.V. (AMS: JDEP), and Keurig Dr. Pepper, Inc. (NASDAQ: KDP).

Qualifications

Mr. Pleuhs holds a law degree from the Christian-Albrechts-University of Kiel, Germany. Mr. Pleuhs brings extensive experience developing and executing strategic decisions, including related to M&A, investor relations, and corporate and government affairs, as well as serving on the boards of directors of national and international companies. We believe that Mr. Pleuhs' extensive management experience and expertise in corporate governance, compliance, and risk management, as well as his knowledge of the global food retail industry qualifies

12

him to serve on our Board.

**Defendant Roberts**

38.     Defendant Roberts has served as a Company director since April 2021.

39.     The 2024 Proxy Statement stated the following about Defendant Roberts:

Biographical Information

Debbie Roberts has served as a member of our Board since April 2021. Ms. Roberts currently serves as Executive Vice President and Chief Operating Officer of Panera Bread, a position she has held since September 2020. Before joining Panera, Ms. Roberts held various roles at McDonald's Corporation (NYSE: MCD) since 1990. Most recently at McDonald's Ms. Roberts served as the President Northeast Zone from December 2014 to December 2016, and the President East Zone from January 2016 to April 2018. She currently serves as a member of the Board of RLI Insurance Company (NYSE:RLI).

Qualifications

Ms. Roberts holds a B.S. in Accounting from University of Illinois Urbana-Champaign. We believe that Ms. Roberts' extensive management experience in the food and beverage industry and financial expertise qualifies her to serve on our Board.

**Defendant Telfer**

40.     Defendant Telfer has served as a Company director since September 2022 and also

serves as a member of the Audit and Finance Committee.

41.     The 2024 Proxy Statement stated the following about Defendant Telfer:

Biographical Information

Philip Telfer has served as a member of our Board since September 2022. Mr. Telfer held senior finance and leadership roles with Mars, Incorporated, including as the Vice President, Finance for Mars Australia/New Zealand, and then the Corporate Finance Staff Officer for Mars Asia Pacific from 2003 to 2011. Prior to joining Mars, Mr. Telfer held finance executive roles with Jardine Matheson Group (OTCMKTS: JMHLY) in Hong Kong, Thailand, and Singapore. Mr. Telfer is currently a private investor based in Australia.

Qualifications

Mr. Telfer holds a Bachelor of Commerce from the University of New South Wales,

13

Australia. We believe that Mr. Telfer's expertise in global financial management and the food retail industry qualifies him to serve on our Board.

**Defendant Weese**

42.     Defendant Weese has served as a Company director since December 2020.

43.     The 2024 Proxy Statement stated the following about Defendant Weese:

Biographical Information

Michelle Weese has served as a member of our Board since December 2020. Ms. Weese currently serves as the Executive Vice President of Corporate Affairs for Novartis AG, a Swiss multinational pharmaceutical corporation based in Basel, Switzerland, a position she has held since July 2023. Prior, Ms. Weese served as Chief Corporate Affairs Officer for Bristol Myers Squibb (NYSE: BMY), a position she has held since June 2021. Before joining Bristol Myers Squibb, from January 2019 to March 2021, Ms. Weese served as the General Secretary North America and member of the North American executive team at France-based Danone (OTCMKTS: DANOY), a $30B food and beverage company and largest certified B-Corp in the world. Prior to Danone, Ms. Weese was the Chief Executive Officer of Stratigence, LLC, a management consulting agency, from 2009 to 2019. Prior to creating Stratigence, Ms. Weese was the Global Head of Corporate Communications for Mars, Incorporated across all brands and businesses. In her more than a decade at Mars, she also served as Senior Vice President of Corporate Affairs North America and held a seat on the North American management team across all brands and divisions.

Qualifications

Ms. Weese holds a B.A. in Journalism from Georgia State University. We believe that Ms. Weese's significant management and finance experience gained through senior leadership positions at several major corporations qualifies her to serve on our Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     By reason of their positions as officers, directors, and/or fiduciaries of KKI and because of their ability to control the business and corporate affairs of KKI, the Individual Defendants owed KKI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage KKI in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in

14

furtherance of the best interests of KKI and its shareholders so as to benefit all shareholders equally.

45.     Each director and officer of the Company owes to KKI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of KKI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

47.     To discharge their duties, the officers and directors of KKI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of KKI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of KKI's Board at all relevant times.

49.     As senior executive officers and/or directors of a publicly-traded company whose

common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

50. To discharge their duties, the officers and directors of KKI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of KKI were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, North Carolina, and the United States, and pursuant to KKI's own Code of Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how KKI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

16

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of KKI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that KKI's operations would comply with all applicable laws and KKI's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51.      Each of the Individual Defendants further owed to KKI and the shareholders the duty of loyalty requiring that each favor KKI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

52.      At all times relevant hereto, the Individual Defendants were the agents of each other and of KKI and were at all times acting within the course and scope of such agency.

53.      Because of their advisory, executive, managerial, directorial, and controlling

positions with KKI, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

54.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by KKI.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

57.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under

18

the authority of the Board, each of the Individual Defendants who is a director of KKI was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of KKI and was at all times acting within the course and scope of such agency.

## KKI'S CODE OF CONDUCT

60.     KKI's Code of Conduct states that it "applies to everyone at *Krispy Kreme*, from the Board of Directors to all employees of Krispy Kreme companies, subsidiaries, and equity partners." The Code of Conduct further represents that it "provides a framework for making ethical choices . . . [that] is a living document that will continue to grow and evolve alongside our company."

61.     With respect to conflicts of interest, the Code of Conduct states the following, in relevant part:

> Simply stated, a conflict of interest occurs when a Krispy Kremer's personal interests conflict or interfere with Krispy Kreme's interests. Certain personal or professional relationships, financial interests, and other employment opportunities could create a conflict of interest and affect your ability to make decisions at work objectively.

19

Here are some scenarios that likely create a conflict of interest:

- accepting compensation or other personal benefits from a source other than Krispy Kreme for your work on behalf of Krispy Kreme

- using your Krispy Kreme position, or Krispy Kreme's property or information, for improper personal gain

- participating in a decision to hire, transfer, promote, or review a family member or someone with whom you have a romantic relationship

- working for or making a sizeable investment in a Krispy Kreme competitor or a company that has a significant financial relationship with Krispy Kreme, such as a material customer or supplier

- accepting gifts, entertainment or favors from Krispy Kreme competitors, customers or suppliers – other than non-cash gifts of nominal value (typically $50 or less per gift and $100 per source per year) or occasional moderate business meals and entertainment, which are generally permissible so long as there is no appearance of a conflict of interest; or

- being involved in an outside activity that competes with our interests.

A conflict of interest may not always be clear-cut. If you are considering entering into a situation where your judgment could be, or could appear to be, influenced in a way that could harm Krispy Kreme, don't proceed without first talking with your supervisor or the Legal Department so that the situation can be reviewed and any necessary actions taken.

62. With respect to competition and fair dealing, the Code of Conduct states, in relevant part:

We want to outperform our competitors because we create the most awesome doughnut experience imaginable and our service is the best out there, not because we are engaging in unethical practices. We are not interested in stealing confidential information or trade secrets from our competitors, customers, suppliers, or anyone else. You shouldn't be either.

There are a host of laws designed to promote free and fair competition and protect consumers.

They generally prohibit:

1. arrangements with competitors that restrain trade,

20

2. abuse of market power to unfairly disadvantage competitors, and

3. misleading or harming consumers.

Some of these laws carry civil and criminal penalties for individuals and companies. So follow them. It boils down to this – do business the right way, and don't take unfair advantage of others.

63. With respect to interacting online and with the media, the Code of Conduct states, in relevant part:

Part of maintaining our reputation and winning over customers is presenting a consistent message to the media and online. Corporate Communications oversees that. Unless they authorize you to speak for Krispy Kreme, don't. We expect you to exercise good judgment if communicating with the press, as well as when participating in online activities, such as posting to online blogs, journals, chatrooms and other social media outlets. Be fair. Be courteous. Be careful not to give the impression that you are speaking for the company unless you have been authorized by the Disclosure Committee.

64. With respect to recordkeeping, the Code of Conduct states the following:

In order for us to make responsible business decisions and get an honest account of our performance, we must maintain accurate and appropriately detailed company records. We must hang on to different types of records for specific lengths of time, as described in our records retention policy. From time to time, our Legal Department may instruct us to retain certain records related to litigations, audits and investigations for even longer. Follow those instructions unless and until you are told otherwise.

65. With respect to confidentiality, the Code of Conduct states, in relevant part:

Certain kinds of company information, if leaked, could significantly hurt our business. Take steps to protect confidential or proprietary information entrusted to you, whether it belongs to Krispy Kreme or someone else who shares it with us under any type of confidentiality agreement. Do not disclose that information unless appropriate protections are in place and have been reviewed by the Legal Department. This obligation extends even after your relationship with Krispy Kreme ends.

66. With respect to waivers, the Code of Conduct states the following:

If circumstances are unclear and you believe that a waiver of any provision of this Code is warranted, you must disclose all the relevant facts and made a request for

21

a waiver with the Legal Department. Waivers for any employees, other than the Global Leadership Team and the principal accounting officer or controller, may only be made by the Chief Legal Officer. Waivers for the Global Leadership Team and the principal accounting officer or controller may only be made by either the Audit and Finance Committee or the Board of Directors. Waivers for a Board member may only be made by the Board of Directors.

67. With respect to the reporting of illegal or unethical behavior, the Code of Conduct

states the following, in relevant part:

If you think something happened or is about to happen that violates this Code, our policies, or the law, speak up.

You are encouraged to talk to your supervisors, managers and/or the Legal Department if you have questions or concerns. If you are more comfortable, the Krispy Kreme Whistleblower Hotline is also available. Reporting may be anonymous if desired, although we hope you will identify yourself to facilitate communication. The Whistleblower Hotline is available 24 hours a day, 7 days a week. This line is answered by an independent company and staffed by trained communications specialists whose only responsibility is listening to and reporting your questions or concerns.

Use of any reporting procedure in bad faith will be considered a violation of this Code. Krispy Kreme does not retaliate for any complaint made in good faith. Any person who takes any action whatsoever in retaliation against any Krispy Kremer who has in good faith raised a question or concern about compliance will be subject to serious sanctions, which may include termination.

All reports of suspected violations of our Code or the law will be taken seriously and promptly reviewed. Krispy Kremers must cooperate with our investigations and comply with any corrective measures imposed as a result.

68. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of

22

Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## KKI'S AUDIT COMMITTEE CHARTER

69.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to oversee the following:

> • the integrity of the Company's financial reporting process and systems of internal controls, including the integrity of the Company's financial statements;
> • compliance with the Company's Code of Conduct and laws and regulations; and
> • the independence, qualifications and performance of the Company's independent auditors and internal audit department.

70.     With respect to the responsibilities of the Audit Committee as they pertain to financial statements, the Audit Committee Charter states the following:

> 6. **Financial Statements.**   Meet to review the annual and quarterly financial statements and discuss them with management and the independent auditors, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." These discussions shall include the matters required to be discussed under applicable rules of the Public Company Accounting Oversight Board and the SEC, and other such inquiries as the Committee or the independent auditors shall deem appropriate. Based on such review and discussion, the Committee shall (a) approve the inclusion of the Company's unaudited financial statements in the quarterly report on Form 10-Q and (b) recommend to the Board whether the Company's audited financial statements should be included in the annual report on Form 10-K.
>
> The financial statement review will include, as needed, a review of analyses prepared by management setting forth significant issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements, any regulatory disclosures required by the SEC and other regulatory bodies (e.g., environmental, social, and governance matters), and a review of the effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the financial statements of the Company.

71.     With respect to the responsibilities of the Audit Committee as they pertain to earnings releases, and the plan and results of the audit, the Audit Committee Charter states the

following:

      7. **Earnings Releases**.  Review and discuss earnings to be issued in the Company's press releases, and periodically review the Company's corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies.

      8. **Plan and Results of Audit**.  Discuss with the auditors the nature and rigor of the audit process, receive and review audit reports, receive the recommendation of management as to the fee to be paid to the independent auditors, and provide the auditors full access to the Committee (and the Board) to report on any and all appropriate matters.  The Committee also shall review and discuss with management and the independent auditors the results of the annual audit, any audit problems or difficulties, and management's response prior to the filing of the annual report on Form 10-K.

      72.     With respect to the responsibilities of the Audit Committee as they pertain to the

Company's internal audit, disclosure controls and procedures, and internal controls, the Audit

Committee Charter states the following:

      9. **Internal Audit**.  Oversee internal audit activities, including discussing with management and the internal auditors the internal audit function's organization, objectivity, responsibilities, plans, results, budget, and staffing.  This includes (a) a review of regular internal reports to management (or summaries thereof) prepared by the internal audit function, as well as management's response; (b) reviewing and advising on the selection and removal of the internal audit director; and (c) an annual review of recommended changes (if any) to the internal audit charter.

      10. **Disclosure Controls and Procedures**.  Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures to ensure that policies are in place to ensure the accuracy of required and voluntary disclosures.

      11. **Internal Controls**.  Discuss with management, the internal auditors and the independent auditors the quality and adequacy of and compliance with the Company's internal controls, including any material weaknesses, significant deficiencies and significant changes in internal controls.  Areas of discussion shall include (a) the reliability of financial reporting; (b) the compliance with applicable codes, policies, laws, and regulations; (c) the preservation of the Company's assets; (d) any special steps adopted in light of material control deficiencies; and (e) the adequacy of disclosures about changes in internal control over financial reporting.

The Committee will review any significant matters and regulatory concerns and any fraud involving management or other employees who have a significant role in the Company's internal controls.  The Committee also will review internal audit plans in significant compliance areas.

24

73.     With respect to the responsibilities of the Audit Committee as they pertain to the

Company's financial condition, financial policies, and accounting principles and disclosure, the

Audit Committee Charter states the following:

12. **Financial Condition**.  Review periodically the Company's financial condition and financing plans, including debt covenant compliance, proposed significant borrowings, and sources and uses of cash.

13. **Financial Policies**.  Review and recommend to the Board for adoption key financial policies such as capitalization, dividend, foreign exchange and investment of funds.

14. **Accounting Principles and Disclosure**.  Review significant developments in accounting rules.  The Committee will review with management recommended changes in the Company's accounting or financial statements and, with the independent auditors, any significant proposed changes in accounting principles, financial statements, and critical accounting matters.

74.     With respect to the responsibilities of the Audit Committee as they pertain to the

Company's legal matters, ethical environment, and procedures for complaints, the Audit

Committee Charter states the following:

17. **Legal Matters**.  Periodically discuss with management and/or the Chief Legal Officer any legal matters (including the status of pending litigation) that may have a material impact on the Company's financial statements, and any significant reports or inquiries from regulatory or governmental agencies.

18. **Ethical Environment**.  Consult with management on the establishment and maintenance of an environment that promotes ethical behavior, including the establishment, communication, and enforcement of policies or codes of conduct to guard against dishonest, unethical, or illegal activities.

19. **Procedures for Complaints**.  Establish and oversee procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, auditing, or federal securities law matters, including procedures for confidential, anonymous submissions.

75.     With respect to the responsibilities of the Audit Committee as they pertain to the

Company's compliance program, the Audit Committee Charter states the following:

20. **Compliance Program**.  At least annually, review the Company's Compliance Program and management's system to monitor compliance with the overall

program.  Meet, at least annually, to review the implementation and effectiveness of the Company's compliance program with the Chief Legal Officer, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Code of Conduct, including any matters involving criminal or potential criminal conduct.  Review on a quarterly basis a report from the Chief Legal Officer regarding the status of any reports of misconduct.

76.     With respect to the responsibilities of the Audit Committee as they pertain to the

Company's risk management, tax strategies, and finance function, the Audit Committee Charter

states the following:

22. **Risk Management**.  Review and discuss the Company's practices with respect to risk assessment and risk management, and oversee and evaluate the Company's risk management policies in light of the Company's business strategy, capital strength, and overall risk tolerance.  The Committee also will evaluate on a periodic basis the Company's investment and derivatives risk management policies, including the internal system to review operational risks, procedures for derivatives investment and trading, and safeguards to ensure compliance with procedures.

23. **Tax Strategies**.  Periodically review the Company's tax strategies and any significant pending audits or assessments.

24. **Finance Function**.  Review, with management, the Company's finance function, including its resources, organization and quality of personnel.  Review with the independent auditors, the internal audit function, and management, the extent to which changes or improvements in financial or accounting practices have been implemented.

77.     In violation of the Audit Committee Charter, the Individual Defendants (as key

officers and members of the Company's Board) conducted little, if any, oversight of the

Company's engagement in the Individual Defendants' scheme to issue materially false and

misleading statements to the public and to facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement,

abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in

violation of the Audit Committee Charter, the Individual Defendants failed to maintain the

accuracy of the Company's records and reports, comply with laws and regulations, act in good

26

faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

78.     Along with its subsidiaries, KKI is a well-established doughnut-based company that operates worldwide.

79.     On October 26, 2022, KKI began to conduct a test-run in which KKI doughnuts would be sold in McDonald's restaurants located and around Louisville, Kentucky. In a joint press release with McDonald's, KKI announced that the two companies would experiment with a partnership in which the aforementioned McDonald's locations would offer KKI's original glazed, iced chocolate with sprinkles, and raspberry-filled doughnuts.[1] Further, McDonald's would offer such KKI products throughout the entirety of the day, and for drive-through orders.[2] McDonald's offered KKI doughnuts individually and in packs of six, with all doughnuts being delivered fresh daily.[3]

80.     The Company noted that the Louisville test-run was successful and conducted another roll-out of KKI doughnuts in McDonald's locations beginning November 12, 2022.[4] The Company expanded its test run to cover 160 restaurants across Louisville and Lexington.[5] Notably,

---

[1] Olivia Evans, *Some McDonald's Will Start Selling Krispy Kreme Doughnuts. Here's Where You Can Get One,* LOUISVILLE COURIER JOURNAL (Oct. 19, 2022, 2:49 PM), https://www.usatoday.com/story/money/food/2022/10/19/mcdonalds-krispy-kreme-doughnuts-where-to-buy/10543255002/.

[2] *Id.*

[3] *Id.*

[4] CJ Daniels, *Krispy Kreme Doughnuts Returns to Louisville-area McDonald's Restaurants*, WHAS 11 (Nov. 11, 2024, 8:12 PM), https://www.whas11.com/article/life/food/krispy-kreme-doughnuts-returns-to-louisville-mcdonalds-restaurants/417-2775cbf1-cf97-4251-928d-3742ffa265cf.

[5] *Id.*

McDonald's stated in their announcement of the second roll-out that KKI's doughnuts would have ". . . nationwide availability at participating restaurants by the end of 2026."[6]

81. On February 25, 2025, all New York McDonald's locations began to serve KKI doughnuts.[7] In the same press release announcing the partnership expansion in New York, McDonald's stated that "[b]y the end of 2025, more than half of all McDonald's restaurants in the United States will offer Krispy Kreme doughnuts[.]"[8]

**<u>False and Misleading Statements</u>**

***February 25, 2025 Press Release***

82. The Relevant Period began on February 25, 2025 when, before the market opened, KKI released its financial results for the fourth quarter of fiscal year 2024 (the "Q4 2024 Press Release").[9] The Company reported a "net revenue of $404.0 million, a decline of 10.4%." Additionally, the Q4 2024 Press Release stated that "[i]n the U.S. segment, net revenue declined $50.9 million, or 17.2%," due in part to "a decline in retail sales" with "DFD average sales per door per week decreased . . . driven by changing customer mix." More specifically, the Q4 2024 Press Release stated, in relevant part:

---

[6] *Id.*
[7] Lucille Barilla, *McDonald's Expands Krispy Kreme to NYC and Brings Back Fan-Favorite Bagel Sandwiches Nationwide*, RETAIL WIRE (February 26, 2025), https://retailwire.com/mcdonalds-krispy-kreme-nyc-bagel-sandwiches/.
[8] *Id.*
[9] KKI operates on a 52- or 53-week fiscal year, with the fiscal year ending on the Sunday closest to December 31 (i.e. KKI's 2024 fiscal year ended on December 29, 2024).

28

*Financial Highlights*
*$ in millions, except per share data*

| | Quarters Ended | | | Fiscal Years Ended | | |
|---|---|---|---|---|---|---|
| | December 29, 2024 | December 31, 2023 | Change | December 29, 2024 | December 31, 2023 | Change |
| **GAAP:** | | | | | | |
| Net revenue | $ 404.0 | $ 450.9 | (10.4)% | $ 1,665.4 | $ 1,686.1 | (1.2)% |
| Operating (loss)/income | $ (11.5) | $ (5.3) | nm | $ (8.7) | $ 13.1 | nm |
| Operating (loss)/income margin | (2.8)% | (1.2)% | -160 bps | (0.5)% | 0.8 % | -130 bps |
| Net (loss)/income | $ (22.2) | $ 1.9 | nm | $ 3.8 | $ (36.6) | nm |
| Net (loss)/income attributable to KKI | $ (22.4) | $ 2.6 | nm | $ 3.1 | $ (37.9) | nm |
| Diluted (loss)/income per share | $ (0.13) | $ 0.02 | $ (0.15) | $ 0.02 | $ (0.23) | $ 0.25 |
| | | | | | | |
| **Non-GAAP** [1]**:** | | | | | | |
| Organic revenue | $ 400.6 | $ 393.5 | 1.8 % | $ 1,658.1 | $ 1,578.8 | 5.0 % |
| Adjusted net income, diluted | $ 1.2 | $ 15.1 | nm | $ 19.2 | $ 46.2 | nm |
| Adjusted EBITDA | $ 45.9 | $ 64.1 | (28.4)% | $ 193.5 | $ 211.6 | (8.6)% |
| Adjusted EBITDA margin | 11.4 % | 14.2 % | -280 bps | 11.6 % | 12.6 % | -100 bps |
| Adjusted EPS | $ 0.01 | $ 0.09 | $ (0.08) | $ 0.11 | $ 0.27 | $ (0.16) |

[1] Non-GAAP figures – please refer to "Non-GAAP Measures" and "Reconciliation of Non-GAAP Financial Measures."

*Key Operating Metrics*
*$ in millions*

| | | Fiscal Years Ended | | |
|---|---|---|---|---|
| | | December 29, 2024 | December 31, 2023 | Change |
| Global Points of Access | | 17,557 | 14,147 | 24.1 % |
| Sales per Hub (U.S.) trailing four quarters | | $ 4.9 | $ 4.9 | — % |
| Sales per Hub (International) trailing four quarters | | $ 10.1 | $ 9.9 | 2.0 % |
| Digital Sales as a Percent of Retail Sales | | 14.4 % | 19.3 % | -490 bps |

\* \* \*

## **Fourth Quarter 2024 Consolidated Results (vs Q4 2023)**

Krispy Kreme's fourth quarter results reflect the strength of the omni-channel model, ***delivering net revenue of $404.0 million, a decline of 10.4%, compared to $450.9 million in the same quarter last year*** primarily due to the sale of a majority ownership stake of Insomnia Cookies in the third quarter of 2024 ($101 million impact) and the 2024 Cybersecurity Incident (estimated $11 million impact). Organic revenue grew 1.8%, driven by the Company's first quarter of Delivered Fresh Daily ("DFD") sales in excess of $100 million worldwide. Organic revenue was impacted adversely by an estimated 280 basis points from lost revenue linked to the 2024 Cybersecurity Incident.

GAAP net loss was $22.2 million, compared to income in the prior year of $1.9 million. GAAP Diluted Loss per Share was $(0.13), a decline of $(0.15) from the same quarter last year.

***Global Points of Access grew 24.1%, linked to the Company's accelerating U.S. expansion now reaching more than 1,900 McDonald's restaurants with daily deliveries of Krispy Kreme doughnuts, alongside growth internationally.***

Adjusted EBITDA in the quarter declined 28.4% to $45.9 million, linked to an estimated $10 million dollar impact from the 2024 Cybersecurity Incident, with Adjusted EBITDA margins contracting 280 basis points to 11.4%. Adjusted EBITDA Margin reflects an estimated 210 basis point negative impact from the 2024 Cybersecurity Incident.

Adjusted Net Income, diluted declined to $1.2 million in the quarter from $15.1 million in the same quarter last year. Adjusted EPS declined $0.08 to $0.01 from $0.09 in the same quarter last year, due to increased interest expense and depreciation and amortization and an estimated impact of $0.04 due to the 2024 Cybersecurity Incident.

* * *

### Fourth Quarter 2024 Segment Results (vs Q4 2023)

***U.S.: In the U.S. segment, net revenue declined $50.9 million, or 17.2%, largely attributable to*** the sale of Insomnia Cookies ($57.4 million impact), ***a decline in retail sales***, and the 2024 Cybersecurity Incident; partially offset by growth in the DFD business. Organic revenue declined by 1.2%, with an estimated headwind of 460 basis points attributable to the 2024 Cybersecurity Incident. Sales per Hub in the U.S. remained consistent at $4.9 million and ***DFD average sales per door per*** week decreased, as expected, and were $631, driven by changing customer mix.

U.S. Adjusted EBITDA decreased 44.0% to $23.6 million with Adjusted EBITDA margin contraction of 460 basis points to 9.6%, of which an estimated 350 basis points were attributable the 2024 Cybersecurity Incident.

* * *

### 2025 Financial Outlook

***Krispy Kreme issues the following guidance for the full year 2025 (vs FY2024)***

- Net Revenue of $1,550 to $1,650 million
- Organic Revenue growth of +5% to +7%
- Adjusted EBITDA of $180 to $200 million
- Adjusted EPS of $0.04 to $0.08
- Income Tax rate between 32% and 36%
- Capital Expenditures of 6% to 7% of net revenue
- Interest Expense, net of $65 million to $75 million

The company expects leverage to trend towards 4.0x by year end 2025.

***February 27, 2024 10-K***

83.     On February 27, 2025, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 29, 2024 (the "2024 10-K"), which was signed by Defendants Charlesworth, Ashukian, Goudet, Andrada, Bell, Capel, Deno, Pleuhs, Roberts, Telfer, and Weese. In relevant part, the 2024 10-K stated:

We added net 3,508 new DFD Doors during the fiscal year as we continue to focus on the deployment of our Hub and Spoke model and our expansion into QSR

30

channels. We plan to continue adding new locations and expanding our digital platform in order to extend the availability of and access to our products. ***We are excited about our partnership with McDonald's and the phasing of the U.S. national rollout, which we believe has validated the attractiveness of the QSR channel.***

***April 23, 2025 Press Release***

84.    On April 23, 2025, the Company issued a press release titled "Krispy Kreme Board Nominates Refreshed Slate of Directors to Support Company's Transformation" (the KKI Board Refresh Press Release). The KKI Board Refresh Press Release stated, in relevant part:

> "Welcoming Bernardo [Hees] to our Board at a pivotal time for Krispy Kreme will be invaluable as we seek to maximize shareholder value through ***our two largest growth opportunities: profitable U.S. expansion*** and capital-light international growth," said Josh Charlesworth, Krispy Kreme CEO.

85.    The statements referenced and identified in ¶¶82-84 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) demand for Krispy Kreme products at McDonald's locations was substantially lower than during the marketing launch of the partnership; (2) the demand or lack thereof for Krispy Kreme products at McDonald's locations was a leading factor in the Company's decline in average sales per door per week; (3) the Company's partnership with McDonald's was not financially viable; (4) the partnership's lack of profitability created a material risk to its continuation; and (5) as a consequence of the partnership's lack of profitability, the Company would halt further expansion into McDonald's locations. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Fully Emerges

86.    The truth fully emerged on May 8, 2025, before the market opened, when KKI reported its financial results for the first quarter of the 2025 fiscal year by filing its quarterly report on Form 10-Q with the SEC (the "Q1 2025 10-Q"). That same day, the Company issued a press

31

release to further report on its financial results for the first quarter of the 2025 fiscal year (the "Q1 2025 Press Release"). KKI announced its "net revenue was $375.2 million . . . a decline of 15.3%" and further reported a "net loss of $33.4 million, compared to prior year net loss of $6.7 million." Moreover, the Company reported that it was both "reassessing [its] deployment schedule together with McDonald's" and "withdrawing [its] prior full year outlook and not updating it" largely on account of "uncertainty around the McDonald's deployment schedule."

87.    More specifically, the Q1 2025 Press Release stated, in relevant part:

**First Quarter Highlights (vs Q1 2024)**

• Net revenue of $375.2 million
• Organic revenue declined 1.0% to $374.7 million
• GAAP net loss of $33.4 million
• Adjusted EBITDA of $24.0 million
• GAAP cash used for operating activities of $20.8 million
• Global Points of Access ("POA") increased 3,168, or 21.4%, to 17,982

* * *

**First Quarter 2025 Consolidated Results (vs Q1 2024)**

Krispy Kreme's first quarter results reflect continued investment ahead of growth in the Company's U.S. nationwide expansion and wider adoption of the capital-light international franchise model. Net revenue was $375.2 million in the first quarter of 2025, a decline of 15.3% or $67.5 million, primarily due to the $64.3 million reduction associated with the divestiture of a majority stake in Insomnia Cookies in the third quarter of fiscal 2024. In line with expectations, organic revenue declined $3.6 million, or approximately 1.0%, as growth in Global Points of Access and Delivered Fresh Daily ("DFD") revenues were more than offset by expected consumer softness leading to a decline in doughnut shop transaction volume.

GAAP Net Loss was $33.4 million, compared to prior year net loss of $6.7 million. GAAP diluted loss per share was $0.20, compared to a loss of $0.05 in the same quarter last year.

Adjusted EBITDA declined to $24.0 million, with Adjusted EBITDA Margin declining to 6.4% as the Company invests ahead of growth and navigates a challenged global consumer backdrop linked to macroeconomic, weather, and inflationary factors. Adjusted Net Loss, diluted was $8.8 million in the quarter. Adjusted Diluted loss per share was $0.05 in the quarter.

32

* * *

**Financial Outlook**

As of March 30, 2025, Krispy Kreme doughnuts are now available in more than 2,400 McDonald's restaurants. ***The Company is reassessing the deployment schedule together with McDonald's while it works to achieve a profitable business model for all parties and does not expect to launch in any additional restaurants in the second quarter of 2025.***

Krispy Kreme continues to believe in the long-term opportunity of profitable growth through the U.S. nationwide expansion including McDonald's.

***Given macroeconomic softness and the uncertainty around the McDonald's deployment schedule, the Company is withdrawing its prior full year outlook and not updating it at this time.***

88.    On this news, the price of the Company's common stock fell $1.07 per share, or 24.71%, from a closing price of $4.33 per share on May 7, 2025 to close at $3.26 per share on May 8, 2025, on unusually high trading volume.

<strong><u>DAMAGES TO KKI</u></strong>

89.    As a direct and proximate result of the Individual Defendants' conduct, KKI will lose and expend many millions of dollars.

90.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO/President, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

91.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

92.    Such expenditures will also include costs incurred in any internal investigations

33

pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

93.     Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

94.     As a direct and proximate result of the Individual Defendants' conduct, KKI has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

95.     Plaintiff brings this action derivatively and for the benefit of KKI to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of KKI, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

96.     KKI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97.     Plaintiff is, and has been at all relevant times, a shareholder of KKI. Plaintiff will adequately and fairly represent the interests of KKI in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

98.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

99.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, KKI's Board consisted of the following eleven individuals: Defendants Charlesworth, Andrada, Bell, Capel, Deno, Goudet, Michaels, Pleuhs, Roberts, Telfer, and Weese (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to six of the eleven Director-Defendants that were on the Board at the time this action was filed.

100.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the materially false and misleading statements alleged herein. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

101.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted KKI to issue materially false and misleading statements. Specifically, the Director-Defendants caused KKI to issue false and misleading statements which were intended to make KKI appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

102.    Additional reasons that demand on Defendant Charlesworth is futile follow.

35

Defendant Charlesworth has served as the Company's President and CEO since January 2024 and as a Company director since January 2024. The Company provides Defendant Charlesworth with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, Defendant Charlesworth was ultimately responsible for the Company's issuance of false and misleading statements during the Relevant Period. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Charlesworth also signed the materially false and misleading 2024 10-K. Moreover, Defendant Charlesworth is named as a defendant in the Securities Class Action. In addition, his insider sales, made with knowledge of material nonpublic information before the information was disclosed to the public, further demonstrate his motive in participating in the scheme. For these reasons, Defendant Charlesworth breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103.    Additional reasons that demand on Defendant Andrada is futile follow. Defendant Andrada has served as Company director since February 2022 and also serves as the Chair of the Remuneration and Nomination Committee. Defendant Andrada has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect

36

corporate assets. Defendant Andrada also signed the materially false and misleading 2024 10-K. For these reasons, Defendant Andrada breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

104.    Additional reasons that demand on Defendant Bell is futile follow. Defendant Bell has served as a Company director since September 2016. Defendant Bell has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Bell also signed the materially false and misleading 2024 10-K. For these reasons, Defendant Bell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

105.    Additional reasons that demand on Defendant Capel is futile follow. Defendant Capel has served as a Company director since June 2024. Defendant Capel has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Capel also signed the materially false and misleading 2024 10-K. For these reasons, Defendant Capel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore,

excused.

106. Additional reasons that demand on Defendant Deno is futile follow. Defendant Deno has served as a Company director since September 2016 and currently serves as the Chair of the Audit and Finance Committee. Defendant Deno previously served as the Chair of the Audit Committee. Defendant Deno has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Deno also signed the materially false and misleading 2024 10-K. For these reasons, Defendant Deno breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

107. Additional reasons that demand on Defendant Goudet is futile follow. Defendant Goudet has served as a Company director since September 2016 and as Chairman of the Board since May 2017. Defendant Goudet has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Goudet also signed the materially false and misleading 2024 10-K. For these reasons, Defendant Goudet breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

108. Additional reasons that demand on Defendant Michaels is futile follow. Defendant

Michaels has served as a Company director since May 2017 and also serves as a member of the Audit and Finance Committee and as a member of the Remuneration and Nomination Committee. Previously, Defendant Michaels served as a member of the Audit Committee and as a member of the Remuneration Committee. Defendant Michaels has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Michaels breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109. Additional reasons that demand on Defendant Pleuhs is futile follow. Defendant Pleuhs has served as a Company director since June 2022 and also serves as a member of the Audit and Finance Committee and as a member of the Remuneration and Nomination Committee. Previously, Defendant Pleuhs served as a member of the Audit Committee and as a member of the Remuneration Committee. Defendant Pleuhs has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Pleuhs also signed the materially false and misleading 2024 10-K. For these reasons, Defendant Pleuhs breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110. Additional reasons that demand on Defendant Roberts is futile follow. Defendant

Roberts has served as a Company director since April 2021. Defendant Roberts has received and continues to receive lucrative compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Roberts also signed the materially false and misleading 2024 10-K. For these reasons, Defendant Roberts breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

111.    Additional reasons that demand on Defendant Telfer is futile follow. Defendant Telfer has served as a Company director since September 2022 and also serves as a member of the Audit and Finance Committee. Previously, Defendant Telfer served as a member of the Audit Committee. Defendant Telfer has received and continues to receive lucrative compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Telfer also signed the materially false and misleading 2024 10-K. For these reasons, Defendant Telfer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Weese is futile follow. Defendant Weese has served as a Company director since December 2020. Defendant Weese has received and continues to receive lucrative compensation for her role as a director. As a trusted Company

director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Weese also signed the materially false and misleading 2024 10-K. For these reasons, Defendant Weese breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

113. Additional reasons that demand on the Board is futile follow.

114. Defendants Deno (as Chair), Michaels, Pleuhs, and Telfer (collectively, the "Audit Committee Defendants") served as members of the Audit Committee (and subsequently the Audit and Finance Committee) at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

115. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to

the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

116.    KKI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for KKI any part of the damages KKI suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

117.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

118.    The acts complained of herein constitute violations of fiduciary duties owed by KKI's officers and directors, and these acts are incapable of ratification.

119. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of KKI. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of KKI, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

120. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause KKI to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

121. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

122. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

43

123.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of KKI's business and affairs.

124.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

125.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of KKI.

126.    In breach of their fiduciary duties owed to KKI, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) demand for Krispy Kreme products at McDonald's locations was substantially lower than during the marketing launch of the partnership; (2) the demand or lack thereof for Krispy Kreme products at McDonald's locations was a leading factor in the Company's decline in average sales per door per week; (3) the Company's partnership with McDonald's was not financially viable; (4) the partnership's lack of profitability created a material risk to its continuation; and (5) as a consequence of the partnership's lack of profitability, the Company would halt further expansion into McDonald's locations. As a result of the foregoing, Defendants' statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

127.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

44

128.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

129.    Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in a lucrative insider sale of Company common stock while the price of stock was artificially inflated, obtaining proceeds of **_roughly $58,000._**

130.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

131.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, KKI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

133.    Plaintiff, on behalf of KKI, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

134.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

135.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, KKI.

136.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from KKI that was tied to the performance or artificially inflated valuation of KKI, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

137.     Plaintiff, as a shareholder and representative of KKI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation as well as proceeds from insider sales, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

138.     Plaintiff, on behalf of KKI, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Abuse of Control**

139.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence KKI, for which they are legally responsible.

141.     As a direct and proximate result of the Individual Defendants' abuse of control, KKI has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142.     Plaintiff, on behalf of KKI, has no adequate remedy at law.

46

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

143.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of KKI in a manner consistent with the operations of a publicly held corporation.

145.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, KKI has sustained and will continue to sustain significant damages.

146.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff, on behalf of KKI, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

148.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

149.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

150.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

47

151.    Plaintiff, on behalf of KKI, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Charlesworth and Ashukian for Contribution Under Sections 10(b) and 21D of the Exchange Act

152.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

153.    KKI and Defendants Charlesworth and Ashukian are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Charlesworth's and Ashukian's willful and/or reckless violations of their obligations as officers and/or directors of KKI.

154.    Defendants Charlesworth and Ashukian, because of their positions of control and authority as officers and/or directors of KKI, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of KKI, including the wrongful acts complained of herein and in the Securities Class Action.

155.    Accordingly, Defendants Charlesworth and Ashukian are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

156.    As such, KKI is entitled to receive all appropriate contribution or indemnification from Defendants Charlesworth and Ashukian.

## PRAYER FOR RELIEF

48

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of KKI, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to KKI;

(c)     Determining and awarding to KKI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing KKI and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect KKI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of KKI to nominate at least six candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding KKI restitution from the Individual Defendants, and each of

them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury.


Dated: June 13, 2025


Respectfully submitted,

**HAUSLER LAW FIRM, PLLC**

<u>/s/ *Kurt F. Hausler*</u>
Kurt F. Hausler
NC Bar No. 22103
524 East Boulevard
Charlotte, NC 28203
Telephone: (704) 247-3255
Fax: (704) 247-3267
Email: khausler@hauslerlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Mark Jimenez, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12 day of June, 2025.

Signed by:

697905BC87E54E9...

Mark Jimenez